I please the Court, my name is Howard Davis, I represent the Petitioner Deshda Koulian and I also want to thank the Court and OIL for accommodating my request to... Yeah, it's okay. You want to raise your voice? Pardon me? Oh, okay. Yeah. I also want to reserve about two minutes for rebuttal time. Sure. There are basically two points here. First of all, this case fits squarely within Avitoba in that Ms. Koulian is Armenian and there is definitely the, under Avitoba, the Court found that there was a pattern of persecution against Armenians in Russia. And in this case, there is clearly in the record a sufficient personal connection to that general pattern of persecution directed against Armenians. In addition, she's within a, as a subgroup of that of being Jehovah's Witnesses, which is also in the records a disfavored religious group. At the same, in the record it was indicated that she did have problems because she was ethnic Armenian, first of all, and also as a Jehovah's Witness. Actually, the presentation, as I look at it, was very much the reverse. The presentation she made before focused on religion, and the Armenian element seems to be a kind of a late addition to the cast. Well, Your Honor, and actually this is the second point that I was going to want to make, an alternative point. And I think that one of the things that actually is troubling about the case is that in her way, Ms. Quillian did try to make much clearer the extent to which she had problems because she belonged to both. It is, I mean, in the, for example, in the declaration that was submitted as a part of the packet here, there was a later declaration that was substituted to the first one, and that is to be found on, I believe, on page 163 of the record. And this one was substituted at the hearing, and the previous one discarded. And she did indicate that I was, even worse condition, I was Armenian and Jehovah's Witness. And then when at a certain point in the hearing, and this is actually on page 94 of the record, when she says that she had a sort of a double problem, I was abused in a double way as Jehovah's Witness and an Armenian. So the judge kind of tides her for this, saying, so you're talking now Armenians but not religion. And I think that even if, you know, one could argue about the quality of the development by Ms. Quillian's attorney at that point, but the judge also has a, has a duty to the health and the development of the record, and she tided her on that point. And the other one works for our purposes and for your clients' purposes, so it probably doesn't matter whether it's one, the other, or both. And I think what we need to focus on, or what the immigration court and BIA appear to focus on, is whether the level of what was inflicted upon your client makes the level of either past persecution or gives enough basis so that she can establish a well-founded fear of future persecution. Because as compared to other cases, certainly there are other more cases, there are other cases where the events were much more horrendous than here. What makes this something that rises to the level of persecution? Well, with regard to a well-founded fear. Well, as I understand it, you're trying to argue for past persecution, which, candidly, I have trouble seeing here. So, yeah, I think probably focus on a well-founded fear. Right. And even if you're saying that, even if one says that, she did, I think, first of all, I think that the Board didn't really address that. The Board just says that it is really just focusing on what it was that happened when she was fired from her position as a teacher. But the Respondent's, excuse me, Petitioner's Attorney on Appeal did raise the point at page, on page 13 of the record, that raising the whole issue of the evidence of the record, of the pattern and practice of problems with Armenians. And the Board really didn't address that. So, I mean, one could also say that, at the very least, the Court should remand to the Board for the development of that issue and perhaps the interplay between the two. The burden is on the Petitioner to make out a case. And unless you're trying to, unless our case law has reached the point of saying if you're Armenian and Russian, you automatically qualify. I don't think we're quite there yet. I'm not sure what it is that the Board should be expected to do. Well, but at least we could. Don't you understand what these questions are that are being asked of you? Are you clear? I mean, didn't they go into her house? You had some Russian police and a Cossack with a whip. Do you remember that? That's in here. Right. With a whip, frankly, I don't remember. What whip is this? Well, I mean, no. Her husband had a whip. Right. No, this is. He was a whipper, but he had a whip. Right. No, this is. And this is what. I mean, I was going to get to that point. Yeah. But you don't have a lot of time. Okay. Or the Cossack brings out a whip. Well, you know, in the incident in October of 97, there was an incident when she had a meeting of Jehovah's Witnesses at her home. And police and Cossack came in and basically drove the people out, and they kept her there for several hours. And what's important here, among other things, besides the fact that it was Jehovah's Witness, but the fact that a Cossack was there. And the Cossacks, as indicated in the record, and if you look at 140, 142 of the record in the State Department reports, it talks about, and in 143, it talks about the use of Cossacks and other extremist groups in law enforcement. And particularly in the Krasnodar region, which is where the, where Kulian is from, if you look to page 142, they talk about Cossacks in that area and the use with law enforcement. And it says that their tactics appear to brutalize and intimidate the area's ethnic minorities and to bring about the group's stated goal of cleansing the area of all non-Slavic Russians. So the fact that he is there, a Cossack is there, and with the group's stated goals of ethnically cleansing the area, I mean, there you have a combination of those two. What did they say to her when she was in her home, and they had the people there, and they had a church service, and the Cossacks came in, and the Cossacks were the whip? I mean, what, did they watch television, or did they sing songs? What did they do? What did they do that would have frightened this woman? Well, first of all, they, you know, they threatened, first of all, they called bad, well, in the record, it says called bad names. Now, it doesn't indicate which bad names. They also threatened that, and they kept her there for, according to her, for three hours and her tormenting her, although they, for her, she said that they did not specifically beat her out of, they knew her, so they knew that she had been a teacher. So that means that they knew her as a teacher, they knew that she was Armenian, in addition to the fact that she was Jehovah's Witness. But they also threatened that if she did this again, they would throw her in jail. So, and therefore, I mean, she can't even practice, because of the problems that Jehovah's Witnesses have been having in, in being able to establish any place of worship in Russia, in addition to the harassment. I mean, she wouldn't even be able to practice her religion. So. If she did what again, they would throw her in jail? If she were to have these meetings at her home, which is the only place that they would be able to meet because, according, because of the problems that they would be having. This basically, either she is deprived of practicing religion or she ends up in jail with all the problems that come from that. So I would say that in the record, there is, there's clearly that, that personal connection to the general problems of Armenians. All right. You want to save the 30 seconds you have left? Yeah, 30 seconds. Okay. Good morning, Your Honors, and may it please the Court. My name is Jeffrey Bernstein. I represent the Attorney General of the United States. First of all, I would like to clear up the Abitoba question. I think counsel indicated that in Abitoba, this Court held that there was a pattern and practice of persecution against Armenians in Russia. That's not true. The Court held that there was a pattern and practice of discrimination, and that pattern and practice of discrimination, combined with the specific acts, which the Court didn't find persecution, but specific acts against Ms. Aritoba established that she had a well-founded, or that she could have had a well-founded fear of persecution. And again, even if the State Department report was the same as that in Aritoba, all it established, according to that Aritoba Court, was that there was a pattern of practice of discrimination, which linked up with specific acts against the petitioner because she was Armenian, amounted to a well-founded fear of persecution. That's not here because, again, everything that she said that happened to her was on account of Jehovah's Witness. She only mentioned Armenian, I think, an Armenian issue twice in the hearing and did not link that up to anything that happened to her. Again, let me come back to the beginning. The Court can reverse only if it finds evidence that compels contrary conclusions of the administrative adjudicators. The administrative adjudicators found that nothing that happened to the petitioner constituted persecution for purposes of the Immigration and Nationality Act and that the petitioner failed to prove that she possesses a well-founded fear of persecution. First, as the case law cited in our brief establishes, and I think as Judge Clifton alluded to, this Court's case law and the other case law of other circuits that we've cited indicates that nothing that happened to her was severe enough to constitute persecution. Persecution is an extreme concept. It requires really horrendous, shocking, conscience-shocking activities, and it does not include odious things that we as Americans may find odious. It's much more extreme than that. She alleges three specific instances of persecution. Well, doesn't the country report discuss discriminatory policies against many religious minorities, especially naming Jehovah's Witnesses as a targeted group? I don't recall that exact. I have it here. I remember that. 126, 127, 128. Right. 29. My recollection is that they were talking about the law, this law that the petitioner relies on, and I'm happy to discuss that law. I think what was going on at that time was the law had been passed which restricted religious organizations. I mean, you'll read the State Department report on the pages you just mentioned, and it indicates that this law was against organizations and hierarchical organizations. It didn't prohibit people like Jehovah's Witnesses from practicing their religion. It absolutely didn't. It said that little groups could form and they could have services, but the overarching religion couldn't proselytize. So what was a Cossack doing in her house with those three policemen? Well, the policeman was there to – He was there, wasn't he? Wasn't there a Cossack there? Well, she testified that there was either a Cossack or a Cossack. I presume it was a Cossack. That, you know, don't hold her responsible for the court report. No, I understand, Your Honor. I'm just – there was a Cossack there. But the only thing they did was they broke up – She said he had a whip, right? A lash of some sort. To be honest with you, I can't remember exactly. They had guns. They certainly had guns and they were a threatening presence. There's no question about that. I'll grant you that. But what they did was they broke up the meeting and they sent the other parishioners away. Only the daughter and the petitioner were there. Petitioner and her daughter were there. And they held her for – well, it says two hours in her statement, three hours in her testimony. And what they did was they – again, they called her names. And, again, as counsel points out, we don't know what names they called her. And they told her that if – Were they friendly names? Oh, I'm sure they weren't. But, you know, I don't know if they were, you dirty Armenian or you dirty Jehovah's Witness. I don't know. I presume dirty Jehovah's Witnesses because that's what they were there for. But, you know, obviously the record doesn't bear anything out. And they told her that she shouldn't have meetings again. I think they told her that she might – she could be prosecuted. And that's it. And the cases cited in our brief establish that, you know, much more conduct, bad conduct by authorities is not persecution. And I'll cite you to Prasad v. INS at 47F, 3rd, 356. No past persecution where Indo-Fijians were subject to religious and ethnic discrimination. Rocks were thrown at the house Y4F by the military. That's my case, isn't it? It could be, Your Honor. I know – You've got to read these cases of mine if you come in here. Absolutely. And I read Prasad. And Abitobi is your case as well. That's why I took particular care to ensure that this was entirely distinguishable from that case. But, anyway, this Court's precedent and the precedent of other courts establish that that is simply not persecution. I think it's interesting to note that Ms. Abitobi – I'm sorry, Ms. Koulian testified that she was required to, as a Jehovah's Witness, to have, I guess, five weekly meetings, and that she – when this meeting was broken up, she explained that the reason they knew was they were keeping particular tabs on her. So, obviously, only one meeting out of the thousands of meetings that she had before, hundreds of meetings that she had before, was broken up. And she testified that she continued to practice her religion, which I presume included her five weekly meetings. She said she conducted these meetings in secret, which is an interesting point, because she said that the reason that these people found her out was because they were keeping close tabs on her, but yet she felt that she could have secret meetings, even if they were keeping close tabs on her. I don't know. Again – That's a nice place there, huh? You know, there are many places in the world that aren't nice places, and I'm happy to be here in the United States, as we all are. God is listening to you now. I understand, and that sounds like approval to me, Your Honor. It does? It does. You deserve a beholder. Exactly. But, again, there are many bad places in the world. Is it raining hail and brimstone? It could be for any reason. I'm sure it's not for me. But, in any event, nothing that happened to her was persecution. She lost her job. Your case law holds that in Abitoba, the individual was unable to work, and she was harassed by the military. You found that that wasn't persecution. It's not persecution here. I want to point out, with respect to the law and a well-founded fear of persecution, the law ostensibly against Jehovah's Witnesses, I want to point out that, number one, she didn't have a well-founded fear of persecution in March of 1997 because she went back to Russia. She came here for a month. She went back. She says that because the law was enacted, she has a well-founded fear of persecution. But as the petitioner's attorney conceded at the hearing, the Jehovah's Witnesses apparently challenged that law as it applied to them, and they won. And the attorney conceded that Jehovah's Witnesses are free to practice in the, I guess, organizations, as well as the individuals who were free to practice before. So that really puts the kibosh on her well-founded fear of persecution argument with respect to religion. And in any event, even if the law hadn't been turned over, an examination of the State Department report, which Judge Pregerson talked about, establishes that that did not interfere with individuals' right to practice Jehovah's Witnesses. It just was intended to prevent organizations, overarching organizations, to gain power. And that's because from 1990 to 1997, when this law was enacted, there was an unprecedented religious freedom in Russia after the fall of the Soviet Union. There was a law passed. Everyone was permitted to practice. And Jehovah's Witnesses increased by, you know, manyfold. And that apparently upset some people who perhaps thought that the Orthodox religion should have been the state religion. And interestingly enough, the law provides, the law which they were talking about provides, that there is no state religion, and it does provide that individuals can freely practice. But in any event, the fear that that law was going to be used to prevent Jehovah's Witnesses from organizing is not well-founded, given the court determination that the law was in conflict, I guess, with the Russian Constitution. And in fact, with respect to the stuff that happened to her after the law was in effect, obviously when the Cossacks came, she said that she didn't want to, well, she did not contest their right to do that. I mean, apparently that, I mean, they came to her house, but she really hadn't violated the law as is described in the State Department report and as it is reproduced in the record. And she could have certainly have gone to the Jehovah's Witnesses, which had a big organization, and contested that, or she could have filed a lawsuit herself. But she didn't. Oh, yeah, yeah. She could have gone to that Cossack headquarters and complained as well. Well, she could have filed a lawsuit as the Jehovah's Witness. I mean, the Jehovah's Witnesses ostensibly were subject to the mighty reign of the Cossacks, which to be honest with you, I don't see in the State Department report. But if there was such, I mean, the Jehovah's Witness Church might well have been afraid of Cossacks, but they filed a lawsuit and they vindicated themselves, and the Court held that the Jehovah's Witnesses could practice. The law can't be interpreted that way. You got a citation of that case? Which case, Your Honor? No, this is the Petitioner's Council ad hearing at the beginning of the hearing. I can't remember exact citation to the hearing, but it's short. The transcript is short. He came in and said, well, you know, I know I've got materials, and I'm paraphrasing, I know I've got materials in the record regarding this law, but the Jehovah's Witness Church has challenged the law, and in fact the State Department report said that the Jehovah's Witness Church had challenged the law. But now we have a decision. The courts in Russia are found in favor of the Jehovah's Witnesses, and he said, now Jehovah's Witnesses can practice freely. And then he said something like, well, but we have a Chen argument. We may not have a well-founded fear argument, but we have a Chen argument. And that's all in the brief. It's a record 68 and 69. Thank you, Your Honor. I see I'm well over my time.  I was just going to ask, has anyone ever told you how distracting it is to go back and forth like this? They have. You're the first one. And I apologize for that. I apologize. That if I might, if I'm a good thing to do, to avoid. Yes, Your Honor. I'm sure it would. Obviously, I apologize for distracting. That's right. And I'll try to stand stiff as I as I just say, I thought you were dodging and ducking, bobbing and weaving. Well, perhaps psychologically, I was, Your Honor, because the questions were tough and and difficult to answer. But I also want to say again that there is no evidence of record that she was anything that happened to her was because on her was on account of her Armenian ethnicity. She made little or no argument either to the immigration judge or to the board regarding anything that ever happened to her because she was of Armenian descent. And her essentially her assertion to the board was that the immigration judge failed to consider my Armenian argument, which he didn't because he did mention the fact that she had stated that she was an Armenian and she had might have had. And the Armenians were disfavored. But the immigration judge concluded in their termination, affirmed by the board that that didn't establish past persecution or didn't establish she had a well-founded fear of persecution. So she really I mean, this argument, I'm not so sure, has been exhausted. If it has been exhausted, it should be rejected out of hand. Your Honor, I'm out of time and I will I will sit down. Thanks very much. A couple of things. First of all, in Avitov itself, the court found that there was no past persecution and did not require past persecution. It did find that whatever it was, the amount of the experiences of Armenia in Russia, that the demonstrated harassment of Armenians in Russia amounts to persecution. And secondly, with regard to the Cossack was there, was with a lash. That's on page 87 of the record. And and she did say that on page 85 of the record that she talked about when we were harassed by Russians. So she did refer at least to something there with regard to the. She did leave and then came to the United States and came back. But the incident in October of 97 happened well after she came back. And then finally, in the record, there is one forty two to one forty four, one of five, one thirty one. There's just a lot of mentioning of of police and extremist groups and something conjunction going after people from the caucuses. And of course, in the Avitov court said that people from Armenia, from the caucuses area. And then finally, on page, for example, on page one of six, we did talk about the problem with the laws with regard to practice of religion. It talked about that, that minority religious groups and some of them have been subject to harassment and that the law, that this reform law is very confusing and then it's applied differently in different areas. And and there's more about that and particularly in one twenty eight where it talks about specific problems that Jehovah's Witnesses have had. And then on one day we've got all that. OK, so how long was she in the country? When did she have forgotten when she arrived? When did she arrive in the United States, the United States? She left. She left the United States actually not long after the October 97 event. I believe that she entered in in December. She left. I'm looking at page 165 in the asylum application. It said that when did you last leave your country? December 21st, 1997. So we're talking about within two months. So she arrived. Yes, she and she last entered the United States in December of 97. So very shortly after she came here with her daughter, then. Yes. First time she came with her daughter with her. The first time she came. I don't I don't know. I don't think that I'm not sure if there's anything in the record about OK. Be kind of important because she might have gone back to get her daughter. I was not. I'm just I know this is not in the record. I was not the attorney. Guaranteed this would have been OK.
judges: Hug, Pregerson, Clifton